IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

VERIZON WIRELESS OF THE EAST,    *
L.P.,                            *
                                 *
          Plaintiff,             *
                                 *
     v.                          *          CV 114-211
                                 *
COLUMBIA COUNTY, GEORGIA;        *
COLUMBIA COUNTY BOARD OF         *
COMMISSIONERS; RON C. CROSS,     *
Individually and in his Official *
Capacity as Chairman of the      *
Columbia County Board of         *
Commissioners; RON THIGPEN,      *
TREY ALLEN, and WILLIAM D.       *
MORRIS, Individually and in      *
their Official Capacities as     *
Members of the Columbia County   *
Board of Commissioners,          *
                                 *
          Defendants.            *

**O R D E R**

On November 7, 2014, Plaintiff Verizon Wireless of the East, L.P. ("Verizon") brought the instant complaint seeking declaratory and injunctive relief, as well as expedited review under the Federal Communications Act of 1934, as amended by the Telecommunications Act of 1996 ("the TCA"). Specifically, Verizon alleges that Defendants' denial of its application to build a 160-foot cell phone tower violates Section 322(c)(7) of the TCA. Consistent with Section 332(c)(7)(B)(v), which

instructs courts to hear and decide such actions on an expedited basis, the Court entered an accelerated briefing schedule on January 7, 2015. (Doc. 15.) For the reasons set forth herein, Verizon's Motion for Summary Judgment (doc. 21) is **GRANTED**, and Defendants' Motion for Summary Judgment (doc. 18) is **DENIED**. Defendants are hereby **ORDERED** to approve Verizon's application for rezoning and special use permit, as well as its variance applications. Additionally, Verizon's Motion to Strike (doc. 28) and Amended Motion to Strike (doc. 31) are **GRANTED**. Verizon's Motion for Oral Argument (doc. 32) is **DENIED**. Finally, all claims against the Commissioner Defendants in their *individual capacities* are **DISMISSED**, and Doug Duncan shall be **SUBSTITUTED** for Ron Thigpen as a defendant in this matter.

## I. BACKGROUND

Verizon is a wireless telecommunications provider seeking to improve the coverage and capacity of its wireless service network in Columbia County, Georgia. (Doc. 21 at 3.) After identifying this purported need, Verizon's radio frequency ("RF") engineer created a search area approximately "3/4 mile east-west and north-south of the intersection of Chamblin Road/Baker Road and Baker Place Road/Long Creek Falls." (Doc. 16, Ex. 1D.) In the course of its search, Verizon determined

that collocating[1] with one of the nine existing towers within four miles of the proposed site would be inadequate for its purposes.[2] (Id.) In addition to researching the availability of existing towers, Verizon's RF engineer opined that a 150-foot tower with a 10-foot lightning rod was "critical to provide the necessary capacity off-load of the most affected sector while still improving coverage to the surrounding commercial and residential areas." (Id.)

The present dispute arises out of the Columbia County Board of Commissioners' ("the Board") denial of Verizon's Rezoning, Special Use Permit, and Variance applications. The Board is the governing body of Columbia County and is composed of four members and a chairman. (Doc. 16, Ex. 16 § 1-2-1 (hereinafter "Columbia County Code").) Consistent with O.C.G.A. § 36-5-22.1,[3] the Board enacts rules, ordinances, resolutions, and regulations. (Id. § 1-2-9.) At all times pertinent to Verizon's applications, Ron C. Cross was the Chairman of the

---

[1]    This term, which is undefined in the record, appears to refer to the shared use of an existing tower.

[2]    According to Verizon, collocating is ideal because it is cheaper, faster, and does not require rezoning. (Doc. 16, Ex. 10 at 14.) However, of the nine existing towers within four miles of the proposed tower, Verizon was already collocated on four of them and the other five were located too far outside the search area to provide the necessary improvements. (Doc. 16, Ex. 1D.)

[3]    O.C.G.A. § 36-5-22.1 lists the subject matters over which the governing authority of each county exercises jurisdiction.

Board, with Ron Thigpen,[4] Trey Allen, and William D. Morris as the other members. (Doc. 16, Ex. 11.)

## A. Verizon's Applications

On July 3, 2014, Verizon submitted Rezoning, Special Use Permit, and Variance applications to allow for a 160-foot monopole to be located at 2029 William Few Parkway, Columbia County, Georgia.[5] (Doc. 16, Ex. 1.) For this new tower, Verizon intended to lease a 10,000 square-foot parcel of land from the Evans Christian Academy. (Id. at 2.) The selection of this location, per Verizon, was based on four factors: (1) the site met the RF engineer's coverage improvement requirements; (2) the site was buildable; (3) the site was leasable; and (4) the site met the zoning ordinances. (Doc. 16, Ex. 8 at 36.)

With its applications, Verizon made three requests, but otherwise contended that the pole met the applicable ordinances. First, Verizon requested that the land be rezoned from "S-1 (school)" to "S-1 (telecommunications facility)." (Doc. 16, Ex.

_____

[4]     Ron Thigpen is no longer a member of the Board. The fourth position was vacant at the time of Verizon's applications. (Doc. 16, Ex. 11.)
[5]     Attached to the application, Verizon included (1) a certificate of title for the subject property; (2) a construction design package; (3) a letter from an RF engineer demonstrating how the site will fit into the existing Verizon Network, justifying the height request, establishing that no existing towers or structures within the area are suitable, and confirming that the site will not cause interference with existing telecommunications devices; (4) propagation maps showing the overall search area; (5) a structural report documenting the tower height and design, anticipated capacity, structural integrity, and failure characteristics; (6) an aeronautical evaluation; (7) a letter of commitment to share space on the tower for public safety and to negotiate in good faith for shared use with other carriers; (8) a tower removal bond; (9) a certificate of liability insurance; (10) a copy of the FCC licenses; and (11) a check for the applications. (Doc. 16, Exs. 1B-1K.)

1A.) Second, it requested a height variance to allow for a 160-foot pole. (Id.) Finally, it requested that the setback requirement be decreased. (Id.)

## B. Special Use Permit/Rezoning

The Columbia County Code requires an applicant to (1) request a Special Use Permit for the construction of any new tower and (2) obtain approval to rezone the property to S-1 (telecommunications facility). (Columbia County Code §§ 18-305, 18-314, 18-332.) The Columbia County Planning Commission "shall accept, review, analyze, evaluate, and make recommendations to the board of commissioners with respect to the granting or not granting . . . of Special Use Permits for wireless telecommunications facilities." (Id. § 18-305(c).) Following this recommendation, the Board retains final authority on rezoning applications. (Id.)

Consistent with these requirements, Verizon submitted an application for a Special Use Permit and to rezone the land to "S-1 (telecommunications facility)." (Doc. 16, Ex. 1A.) In support of its application, Verizon submitted a letter from its RF engineer, Ralph Richter, who stated that "Verizon Wireless has an immediate need for a new communications facility in this area to provide capacity relief and improved indoor coverage in this area of Columbia County." (Doc. 16, Ex. 1D at 1.) Verizon contends that the pole would serve two objectives: (1) improving

capacity and (2) increasing coverage. According to Verizon, the capacity issues result in dropped calls, slow data, and an inability to make calls and that a new pole would ease the burden on a tower located at 5114 Columbia Road. (Doc. 16, Ex. 8 at 39.) For the coverage objective, Verizon contends that the pole would improve in-building and in-vehicle service.[6] (Id. at 44.)

Verizon submitted evidence that it conducted a search "approximately 3/4 mile east-west and north-south of the intersection of Chamblin Road/Baker Road and Baker Place Road/Long Creek Falls." (Doc. 16, Ex. 1D.) Moreover, Verizon attempted to utilize existing towers, even those outside the search area. (Id.) In its search, Verizon identified nine towers within four miles of the proposed site. Four of those towers were already used by Verizon, and Verizon's RF engineer determined that the other five were too far outside the search area to achieve the stated goals. (Id.) In support of the RF engineer's determination, Verizon provided Columbia County with various maps showing the search area, existing towers, and coverage differences based on tower location. (Doc. 16, Ex. 1E.)

---

[6]     Defendants vehemently dispute the coverage benefits in their briefs while arguing that the denial of the applications does not have the effect of prohibiting the provision of personal wireless services. Because the Court ultimately finds that Defendants failed to support their decision with substantial evidence, it need not address the coverage disputes at this time.

## C. Height Variance

Section 18-308(b) of the Columbia County Code sets the maximum height for telecommunications towers at 110 feet.[7] To accommodate a 160-foot tower, Verizon requested a variance from that requirement.

In support of its application for a height variance, Verizon provided maps comparing the coverage differences between a 160-foot pole, a 130-foot pole, and a 110-foot pole. (Doc. 16, Ex. 4.) These maps were keyed based on "best," "good," and "moderate" coverage. "Best" meant that "customers can expect, with a very high probability, to make and receive calls outdoors, including in-vehicle. In addition, the signal should be sufficient for most in-building coverage. However, in-building coverage can and will be adversely affected by factors such as thickness/construction type of walls and location within the building[.]" (Id. at 15.) "Good" indicated that "customers can expect to make and receive calls outdoors, including in-vehicle. In-building service will be more variable and very dependent on factors such as thickness/construction type of walls and location within the building[.]" (Id.) And "moderate" meant that "customers can expect to make and receive calls outdoors. In-vehicle service may experience some 'dead

---

[7] This ordinance has since been amended to allow for a maximum height of 150 feet.

spots' (loss of service) and in-building coverage will be less likely." (Id.) These maps, in an effort to show the impact of the proposed tower, include an oval shaped ring that reflects the "[p]roposed tower capacity offload/indoor coverage improvement area." (Id. at 8.) The Court refers to the area inside this ring as the "tower coverage zone."

At 160 feet, the majority of the tower coverage zone was keyed "best," with minimal "good" coverage areas and no "moderate" coverage areas. (Id. at 5.) At 130 feet, there even more "best" areas of coverage, but there were more areas of diminished coverage *outside* the tower coverage zone. (Id. at 6.) This meant that, while apparently improving coverage within the tower coverage zone, other areas would suffer as a result of a 130-foot tower. Finally, the 110-foot tower saw approximately the same coverage as a 160-foot tower, but like the 130-foot tower there was an increase in diminished coverage areas outside the tower coverage zone. (Id. at 7.) Aerial views of the 110-foot map showed that these areas of potentially-diminished coverage are residential. (Id. at 9-13.)

The reduction in coverage shown in the maps "would mean that a call being made in-building at that spot were the tower at 160 [feet], may not be able to be made in-building at that spot and would have to be made outside or possibly in-vehicle to get reliable service if the proposed tower height is decreased."

(Id. at 14.) According to Verizon, to maintain the same level of coverage provided by the 160-foot tower, it would have to build at least two 110-foot towers. (Doc. 16, Ex. 10 at 17.) As Verizon stated at the Planning Commission hearing, a 160-foot tower "is the minimum height our RF engineer has determined that will allow us to connect to all the towers in the area and provide seamless coverage. Reducing the height to 110 feet will severely diminish certain areas of coverage[.]" (Id. at 8.)

D.    **Setback Variance**

In addition to the height requirement, Section 18-312 requires a wireless facility to be setback from adjacent property lines a distance equal to the height of the tower. The proposed tower height is 160 feet, meaning that the setback distance must equal 160 feet. However, Verizon sought a variance from this request given the "unique size and topography of the subject property[.]" (Doc. 16, Ex. 1 at 2-3.) More specifically, Verizon sought permission to have a setback of just 110 feet to the southeast and southwest. (Id.)

In support of its request, Verizon provided a report from Sabre Industries. (Doc. 16, Ex. 1F.) The report indicated that the proposed pole would be designed for 90 mile per hour winds without ice, and 30 mile per hour winds with 3/4 inch ice. (Id.) According to Sabre Industries, "it is highly unlikely that the monopole will fail structurally in a wind event where

9

the design wind speed is exceeded within the range of the built-in safety factors." (Id.) The Sabre report went on to say:

> Should the wind speed increase beyond the capacity of the built-in safety factors, to the point of failure of one or more structural elements, the most likely location of the failure would be within the flanged connection at the bottom of the top section. Assuming that the wind pressure profile is similar to that used to design the monopole, the monopole will yield at the location of the highest combined stress ratio within the flanged connection. This is likely to result in the portion of the monopole above 'folding over' onto the portion below, essentially collapsing upon itself. . . . In the unlikely event of total separation, this, in turn, would result in collapse of that section to the ground within a radius equal to 1/3 of the pole height.

(Id.) Thus, even if the pole were to fail completely at the top section, the dislodged pole would reach a radius of approximately 54 feet.

## E.     Administrative Process

On August 7, 2014, the Planning Department certified that Verizon's applications and materials were complete. (Doc. 16, Ex. 2.) On September 18, 2014, the Planning Department Staff ("the Staff") issued two reports, one addressing the Special Use Permit and the other addressing the variance requests. (Doc. 16, Exs. 6-7.) That same day, a hearing was held before the Planning Commission. (Doc. 16, Ex. 9.) Finally, the Board met on October 7, 2014. (Doc. 16, Ex. 11.)

*i.*     *The Staff Report*

Following review of Verizon's application, the Staff recommended approval of the Rezoning and Special Use Permit, specifically recognizing that the tower would not burden existing public facilities, the application was in conformity with the policy and intent of the land use plan, and the proposal reflected a reasonable balance between the promotion of health, safety, and welfare and the right to unrestricted use of property.[8]  (Doc. 16, Ex. 6.)  Moreover, the Staff recommended approval of the setback variance without much comment.  (Doc. 16, Ex. 7.)  The Staff recommended denying the height variance, however, stating that "the additional height from 110 feet to 160 feet would not provide a significant increase in the amount of coverage to the area."  (Id.)  The Staff additionally noted that other towers within the County did exceed the maximum height, but that "the majority are county-owned and are used for public safety purposes."  (Id.)  In its recommendation, the Staff recognized that "[t]he Planning Commission [cannot] act in recommendation of the cell tower height variance (Section 18-308) because the Code exclusively reserves this decision to the Board of Commissioners."  (Doc. 16, Ex. 7.)

---

[8]     The Staff did note that the pole could be perceived as an "aesthetic detriment" and "has the potential to affect the aesthetic quality of the area's skyline."  (Doc. 16, Ex. 6.)

*ii.   Planning Commission Review*

The Columbia County Planning Commission held a hearing on September 18, 2014 at 6:00 PM.   (Doc. 16, Ex. 9.)   Verizon's applications were introduced by Planning Department Interim Director Andrew Strickland.   (Doc. 16, Ex. 10.)   As to the Special Use Permit, the Commission recommended approval.   (Doc. 16, Ex. 10 at 27.)   Indeed, one unidentified speaker stated that "I think there's definitely a need.   I know somebody that lives right down the road there and they don't have the problem with the cell service but the internet is extremely [slow][9] and it's right down eight or ten houses from below it so I know they'll be excited."   (Id. at 28.)

 . As to the variances, the Planning Commission recommended approval of the setback variance and disapproval of the height variance because "we don't really have a say."[10]   (Id. at 27.) As to the setback variance, Mr. Strickland explained that

> [g]iven the design of the mono-pole tower and the way it actually falls, if it were to fall, the fall radius is far lower than the actual height, so it's not a direct line fall . . . .   It really has break points on the tower and would collapse within, I believe the distance would be about 54 feet according to the application.

---

[9]     The Court assumes, based on the context of the statement, that the unidentified speaker intended to question the speed/effectiveness of the internet service.

[10]     According to the Planning Commission, "[t]he commissioners are the ones that ultimately get to decide the height of the tower so it's a preliminary thing."   (Doc. 16, Ex. 10 at 27.)

(*Id.* at 4.) Verizon's representative was asked a number of questions from unidentified members of the Planning Commission. These questions addressed (1) whether a lower · tower would increase data speed (doc. 16, ex. 10 at 11); (2) whether residents are getting the service they need at lower heights (*id.* at 13-14); (3) the coverage and capacity maps (*id.* at 14-16); (4) the heights of other towers in Columbia County (*id.* at 19); (5) a previous request from Verizon (*id.* at 20); (6) how long would it take for Verizon to outgrow the proposed tower at 160 and 110 feet (*id.* at 20, 23);[11] (7) how many households are serviced by a single tower[12] (*id.* at 21); (8) whether Verizon received any negative comments from neighbors (*id.* at 24); (9) how the tower would be accessed (*id.*); (10) whether the surrounding trees and sights would be disturbed (*id.*); and (11) camouflaging the tower (*id.* at 25).

At the hearing, no contradictory evidence was presented, nor did any resident speak in opposition to Verizon's proposal.

### iii. *The Board Hearing*

Following the Planning Commission's recommendation, the Board met on Tuesday, October 7, 2014 at 6:00 PM. (Doc. 16, Ex. 11.) At the outset of the meeting, Defendant Commissioner

---

[11]    At this point, Mr. Strickland commented that the proposed area receives a lot of interest from developers given its close proximity to Fort Gordon. (Doc. 16, Ex. 10 at 24.)

[12]    This question was raised in light of a recently approved "600 and 60-some odd" subdivision that would be built in close proximity to the proposed tower. (Doc. 16, Ex. 10 at 22.)

Morris made a motion to deny Verizon's rezoning application. (Doc. 16, Ex. 13 at 2.) In response to that motion and in light of the Planning Commission's recommendation, Verizon focused its presentation on the height variance, summarizing the "absolutely critical" nature of the site and the lack of any objections to building the tower. (Id. at 2-3.)

At that time, Chairman Cross presented the Board's two concerns: (1) the tower's proximity to a residential area and (2) the Board's pending amendment to the Columbia County Code allowing towers to reach 150 feet. (Id. at 3.) To address those concerns, Verizon summarized the current need in that area and how a new tower would benefit residents. (Id. at 3-4.) Thereafter, Chairman Cross stated, "Well, we were concerned about the safety aspect, particularly if we allowed a variance to go beyond the requested – which was coupled with this and the location was the main reason that we have concern and really don't think it should be put on that site." (Id. at 4.) As to the safety issues, Verizon turned the Board's attention to the Sabre report, emphasizing that the fall zone of the tower would only be a fraction of the tower's height. (Id. at 4.) Verizon also reiterated that a second tower would be needed if a 160-foot tower was not approved. (Id. at 4-5.)

In summary fashion, the Chairman stated "[w]e understand that concept but it doesn't change the concern about the

14

location and the proximity to the neighboring — the neighborhoods." (Id. at 5.) The Board then unanimously voted to deny the Rezoning/Special Use Permit and removed the variances from consideration. (Id.) The next day, the Board sent Verizon a letter restating that it denied the request to rezone the property, and that the variances were "negated by the denial of the rezoning." (Doc. 16, Ex. 14.)

## II. Motion to Strike

At the outset, Verizon has moved to strike a number of exhibits attached to Defendants' briefs. (Docs. 28 & 31.) Specifically, Verizon moves to strike the following ten exhibits:

1. A printout from Verizon's website detailing the available coverage at the proposed tower's location. (Doc. 25, Ex. 1.)

2. A printout from Verizon's website detailing digital coverage at the proposed tower's location. (Id., Ex. 2.)

3. An application Verizon submitted for a tower in Oconee County, Georgia in August 2014. (Id., Ex. 3.)

4. A Sabre Industries report from January 9, 2014 for a tower in Oconee County, Georgia. (Id., Ex. 4.)

5. A "Winter Storm Event Situation Report and Timeline" from February 10, 2014. (Id., Ex. 5.)

6.  A second "Winter Storm Event Situation Report and Timeline" from February 10, 2014 showing ice and snow accumulations. (<u>Id.</u>, Ex. 6.)

7.  A "Winter Storm Event Situation Report and Timeline" from February 11, 2014. (<u>Id.</u>, Ex. 7.)

8.  Another "Winter Storm Event Situation Report and Timeline" from February 11, 2014 stating that total ice accumulation would exceed 1 inch in some areas. (<u>Id.</u>, Ex. 8.)

9.  An article titled "National Advertising Division Calls on Verizon to Discontinue 'More Everything' TV Spot." (Doc. 29, Ex. 1.)

10.  A copy of the Memorandum of Land Lease Agreement between Verizon and Evans Christian Academy, Inc. (<u>Id.</u>, Ex. 2.)

Verizon contends that the exhibits (1) are unauthenticated and (2) fall outside the written administrative record.

Defendants respond that Exhibits 1 and 2 to their Response Brief address new arguments raised by Verizon, specifically that the new tower is intended to address "significant gaps" in coverage. For these exhibits, Defendants cite a number of cases holding that district courts may look to evidence outside the administrative record when addressing the anti-prohibition clause in the TCA. Defendants additionally argue that these exhibits would be proper for judicial notice and that an affidavit is unnecessary for foundational purposes.

Turning to Exhibits 3 through 8 of Defendants' Response Brief, as well as Exhibit 1 of Defendants' Reply, Defendants freely admit that these exhibits were not considered by the

Board in reaching its decision. (Doc. 33 at 9 ("Defendants have not contended that [Exhibits 25-3 and 25-4] represent evidence that was considered by the Board . . . nor has any representation to that effect been made in any brief by Defendants."); Id. at 11 ("Defendants do not contend that the Board [] considered the weather reports contained in Exhibits 25-5 through 25-8 when they made the determination to deny Verizon's Applications, nor has any representation to that effect been made in any brief filed by Defendants."); Id. at 14 ("As before, Defendants have not contended or represented that Exhibit 29-1 was utilized by the Board . . . in reaching their decision to deny the Applications at issue in this case.").) Instead, Defendants contend that these exhibits are appropriate (1) "to provide the good-faith basis for several assertions given the lack of discovery in this case" (id. at 9) and (2) to demonstrate "that Verizon's litigation position in this case is inconsistent with its litigation position in other cases" (id. at 12).

When addressing whether the Board's decision was supported by substantial evidence, this Court is limited to that evidence included in the written record. See Preferred Sites, 296 F.3d at 1220 n.9 (holding that an Appellant cannot present justifications that "were not espoused prior to the commencement of this action" and "may not rely on rationalizations

17

constructed after the fact to support the denial of Appellee's application. Instead, as the TCA requires, the reasons for the denial of a request to place, construct, or modify personal wireless facilities must be supported by substantial evidence contained in a written record."); TowerCom V, L.L.C. v. City of College Park, No. 1:13-cv-530, 2013 WL 4714203, at *6 (N.D. Ga. Aug. 21, 2013) ("The written record is the record created at the time the decision was made." (internal quotations omitted)).

Defendants appear to recognize that Exhibits 1 and 2 to Defendants' Response Brief (doc. 25) were not part of the written administrative record. Instead, they contend that this Court may properly consider them to address whether a significant gap in coverage exists. Defendants are correct that this Court may consider evidence outside the administrative record when addressing an effective prohibition claim. However, the Court today does not address the effective prohibition claim, but rather rests its holding on the lack of substantial evidence. As such, the Court is limited to the evidence contained in the written administrative record, and for that reason Exhibits 1 and 2 have no place in the Court's consideration. Likewise, Exhibits 3 through 8 of Defendants' Response Brief, as well as Exhibit 1 to Defendants' Reply, must be stricken as Defendants admit that these exhibits were not relied upon by the Board in making its decision.

Finally, Exhibit 2 to Defendants' Reply is a Memorandum of Lease. This exhibit is purportedly offered to address an unsupported allegation made by Verizon in its briefs regarding ownership and lease of the subject property, an issue that is primarily argued with regard to the propriety of an injunction. Although there is a reference in the record to the land being leased by Verizon, no issue was ever raised on the written record as to Verizon's lease of the property and, for that reason, the Court will not consider it in determining whether the Board's decision was supported by substantial evidence. Moreover, the record does show that an authorized agent of Evans Christian Academy, the owner of the subject property, actually signed Verizon's application. (Doc. 16, Ex. 1A.)

Based on the foregoing, Verizon's Motion to Strike (doc. 28) and Amended Motion to Strike (doc. 31) are **GRANTED**.

### III. **SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Facts are "material" if they could affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The Court must view the facts in the light most favorable to the non-moving party,

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in [its] favor." U.S. v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (internal punctuation and citations omitted).

The moving party has the initial burden of showing the Court, by reference to materials on file, the basis for the motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). How to carry this burden depends on who bears the burden of proof at trial. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). When the non-movant has the burden of proof at trial, the movant may carry the initial burden in one of two ways — by negating an essential element of the non-movant's case or by showing that there is no evidence to prove a fact necessary to the non-movant's case. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 606-08 (11th Cir. 1991) (explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex, 477 U.S. 317). Before the Court can evaluate the non-movant's response in opposition, it must first consider whether the movant has met its initial burden of showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. Jones v. City of Columbus, 120 F.3d 248, 254 (11th Cir. 1997) (per curiam). A mere conclusory

statement that the non-movant cannot meet the burden at trial is insufficient. Clark, 929 F.2d at 608.

If — and only if — the movant carries its initial burden, the non-movant may avoid summary judgment only by "demonstrat[ing] that there is indeed a material issue of fact that precludes summary judgment." Id. When the non-movant bears the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carried its initial burden. If the movant presents evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." Fitzpatrick, 2 F.3d at 1116. If the movant shows an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1117. The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. See Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981). Rather, the non-movant must respond with affidavits or as otherwise provided by Federal Rule of Civil Procedure 56.

That this matter comes before the Court on cross motions for summary judgment does not alter the Court's standard of review, "but simply requires a determination of whether either of the parties deserves judgment as a matter of law on the facts that are not disputed." United States ex rel. Saldivar v. Fresenius Med. Care Holdings, Inc., 972 F. Supp. 2d 1339, 1341 (N.D. Ga. 2013) (citing Am. Bankers Ins. Grp. V. United States, 408 F.3d 1328, 1331 (11th Cir. 2005)). Accordingly, each motion must be considered "on its own merits, resolving all reasonable inferences against the party whose motion is under consideration." Id. As the Eleventh Circuit has held:

> Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed . . . . Nonetheless, cross-motions may be probative of the non-existence of a factual dispute when [] they demonstrate a basic agreement concerning what legal theories and material facts are dispositive.

United States v. Oakley, 744 F.2d 1553, 1555-56 (11th Cir. 1984) (quoting Bricklayers Int'l Union, Local 15 v. Stuart Plastering Co., 512 F.2d 1017, 1023 (5th Cir. 1975)).

In this action, the Clerk of the Court gave all parties notice of the motions for summary judgment and informed them of the summary judgment rules, the right to file affidavits or other materials in opposition, and the consequences of default. (Docs. 20 & 22.) Therefore, the notice requirements of Griffith

v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam),
are satisfied. The time for filing materials in opposition has
expired, and the motions are now ripe for consideration.

## IV. DISCUSSION

With the TCA, Congress aimed "to provide for a pro-
competitive, de-regulatory national policy framework designed to
accelerate rapidly private sector deployment of advanced
telecommunications and information technologies and services to
all Americans by opening all telecommunications markets to
competition[,]" H.R. Conf. Rep. No. 104-458, at 113 (1996),
reprinted in 1996 U.S.C.C.A.N. 124, 124, and "to promote
competition and reduce regulation in order to secure lower
prices and higher quality services for American
telecommunications consumers and encourage the rapid deployment
of new telecommunications technologies." Telecommunications Act
of 1996, Pub. L. No. 104-104, 110 Stat. 56, 56 (1996). With
regard to the construction of new telecommunications facilities,
"Congress recognized zoning decisions by state and local
governments had created an inconsistent array of requirements,
which inhibited both the deployment of personal communications
services and the rebuilding of a digital technology-based
cellular telecommunications network." Preferred Sites, LLC v.
Troup Cnty., 296 F.3d 1210, 1214 (11th Cir. 2002) (citing H.R.

Rep. No. 104-204, at 94 (1995), reprinted in 1996 U.S.C.C.A.N. 10, 61).

This regulatory framework notwithstanding, "[l]and use decisions are basically the business of state and local governments[,]" Am. Tower, LP v. City of Huntsville, 295 F.3d 1203, 1206 (11th Cir. 2002), as such regulations are "perhaps the quintessential state activity." FERC v. Miss., 456 U.S. 742, 768 n.30 (1982). For that reason, Congress specifically acknowledged "there are legitimate State and local concerns involved in regulating the siting of such facilities . . . , such as aesthetic values and the costs associated with the use and maintenance of public rights-of-way." H.R. Rep. No. 104-204 at 94-95, reprinted in 1996 U.S.C.C.A.N. 10, 61. Thus, "Congress enacted § 704(a)[13] to 'preserve[ ] the authority of State and local governments over zoning and land use matters except in . . . limited circumstances . . . .'" Preferred Sites, 296 F.3d at 1214 (quoting H.R. Conf. Rep. No. 104-458 (1996), at 207-08, reprinted in 1996 U.S.C.C.A.N. 124, 222) (alteration in original).

These "limited circumstances" boil down to three basic substantive restrictions, as well as a mechanism "for judicial relief for persons aggrieved by decisions inconsistent with

---

[13]    Section 704(a) is codified as 47 U.S.C. § 332(c)(7).

§ 704(a)'s requirements." __Preferred Sites__, 296 F.3d at 1215.

As to the substantive limitations:

> Local zoning authorities [1] may not unreasonably discriminate among providers of functionally equivalent services, [2] may not make zoning decisions which prohibit or effectively prohibit the provision of personal wireless services, and [3] may not make zoning decisions premised on concerns regarding the environmental effects of radio frequency emissions associated with wireless telephone service.

__Id.__ (citing 47 U.S.C. §§ 332(c)(7)(B)(i)(I & II) & 332(c)(7)(B)(iv)). Procedurally, the TCA additionally requires that any decision to deny approval for the construction of a wireless facility be "in writing and supported by substantial evidence contained in a written record." 47 U.S.C. § 332(c)(7)(B)(iii). Should a state or local government act in a manner inconsistent with the TCA's requirements, an aggrieved individual may "within 30 days after such action . . . commence an action in any court of competent jurisdiction." __Id.__ § 332(c)(7)(B)(v).

Here, Verizon makes two challenges to the Board's decision to deny its applications: (1) the denial was not supported by substantial evidence and (2) the denial has the effect of prohibiting the provision of wireless services. Because the Court finds that the Board's decision was unsupported by substantial evidence, it need not address Verizon's second contention.

**A.    Whether The Board's Decision Was Supported By Substantial Evidence**

   *i.    Substantial Evidence Standard*

   "Substantial evidence is more than a mere scintilla.    It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938).    And while this standard might not be as demanding as the preponderance of the evidence standard, it remains incumbent on the district court "to take a harder look than when reviewing under the arbitrary and capricious standard."  Preferred Sites, 296 F.3d at 1218 (citing Color Pigments Mfrs. Ass'n, Inc. v. OSHA, 16 F.3d 1157, 1160 (11th Cir. 1994)).    "Evidence is not substantial if it is overwhelmed by other evidence or if it constitutes mere conclusion."  Kreso v. Shinseki, No. 11-cv-02378, 2014 WL 4436418, at *1 (D. Colo. Sept. 9, 2014) (citing Olenhouse v. Commodity Credit Corp., 42 F.3d 1560, 1581 (10th Cir. 1994)).[14] Accordingly, this Court must "view the record in its entirety, including evidence unfavorable to [the Board's] decision."  Preferred Sites, 296 F.3d at 1218 (citing Am. Textile Mfrs. Inst., Inc. v. Donovan, 452 U.S. 490, 523 (1981)).

---

[14]    Congress intended for "substantial evidence" to be "the traditional standard used for judicial review of agency actions."  H.R. Conf. Rep. 104-458, at 208, reprinted in 1996 U.S.C.C.A.N. 124, at 223.

While "highly deferential," T-Mobile S. LLC v. City of Jacksonville, Fla., 564 F. Supp. 2d 1337, 1345 (M.D. Fla. 2008), the reviewing court "must overturn the Board's decision if it 'cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view.'" Group EMF, Inc. v. Coweta Cnty., 131 F. Supp. 2d 1335, 1338 (N.D. Ga. 1999) (quoting BellSouth Mobility, Inc. v. Gwinnett Cnty., Ga., 944 F. Supp. 923, 928 (N.D. Ga. 1996)).

In applying the TCA, there is some degree of uncertainty as to who carries the burden of proving that the denial was or was not supported by substantial evidence. As cited by Defendants, the Eleventh Circuit has clearly held that "[u]nder Section 332's 'substantial evidence' standard, the party seeking to overturn the local zoning board's decision has the burden of proving that the decision is not supported by substantial evidence." City of Huntsville, 295 F.3d at 1207-08. Even so, a great number of district courts have held the opposite. See TBCom Props., LLC v. City of New Smyrna Beach, No. 6:06-cv-1677, 2007 WL 1970863, at *2 (M.D. Fla. July 3, 2007) (listing cases); Omnipoint Commc'ns Enters., Inc. v. Town of Amherst, 74 F. Supp. 2d 109, 122-23 (D.N.H. 1998) ("Although a telecommunications provider must come forward with a certain minimal amount of

information in support of its applications in order to prevail, once an application has been supported this provision places the burden of proof to support any denial on the local government entity issuing the denial."). This Court, however, need not determine which party ultimately carries this burden. It suffices to say that regardless of whose burden it was to carry, a complete and independent review of the record before the Court demonstrates that the Board's denial of Verizon's application was not supported by substantial evidence.

      ii.    *The Board's Denial of Verizon's Applications Was Not Supported By Substantial Evidence*

In denying Verizon's applications, the Board expressly relied on two concerns: (1) that the Board was considering a change to the height ordinance, increasing the maximum height to 150 feet and (2) that the monopole would be located in close proximity to neighborhoods and sidewalks. In their brief, Defendants add a third basis for denial: that Verizon failed to carry its initial burden of supporting its variance applications.[15] The Court will address each stated reason[16] in turn.

---

[15]    As will be discussed in greater detail below, the Court has serious doubts as to whether this basis is properly before the Court, as it was never raised in the written record during the administrative process.

[16]    In the interest of thoroughness, the Court scoured the record for any possible alternative bases for denial. First, the Staff did report that the pole could be seen as an aesthetic detriment. This concern, however, was never raised by the Planning Commission or the Board. Even so, a "blanket aesthetic objection does not constitute substantial evidence" under the TCA.

a.   *Pending Amendment to Ordinance*

According to Chairman Cross, the Board was, at the time of Verizon's application, considering increasing the maximum height of a cell phone tower to 150 feet. This, according to Chairman Cross, formed one of the two stated reasons for denying Verizon's application. However, zoning applications must be considered based upon the ordinance in effect, regardless of whether the Board was considering an amendment. Sprint Spectrum, L.P. v. Jefferson Cnty., 968 F. Supp. 1457, 1469 (N.D. Ala. 1997). For that reason, the Court finds that this "concern" was not a valid consideration and thus not based on substantial evidence. Moreover, the Court fails to see how the potential amendment would *deter* the Board from granting the variance in any event. The amendment, which ultimately passed, simply reduced the variance requested by Verizon from 50 feet to 10 feet.

---

Verizon Wireless Pers. Commc'ns LP v. City of Jacksonville, 670 F. Supp. 2d 1330, 1339 (M.D. Fla. 2009).

The only other basis the Court could glean from the record was also in the Staff's report, wherein it stated the additional height increase would not provide a significant increase in coverage. This statement garnered no discussion at the Board meeting, nor did it have any context or support within the Staff's report. Indeed, Verizon submitted a number of maps demonstrating impact of the tower's height on coverage. These maps, which were discussed in detail by Verizon's representative at the Planning Commission hearing, were seemingly ignored at the Board meeting on October 7, 2014. Moreover, at no point did the Board question the coverage, nor did it explicitly consider the height variance. Accordingly, the Court finds that these additional, albeit unstated, bases were not supported by substantial evidence either.

### b.    Safety Concerns

As is clear from the parties' briefing, safety formed the primary basis for denial of Verizon's applications.[17]  Throughout their briefs, however, Defendants take somewhat inconsistent positions as to the framing of this argument.  On the one hand, they consistently argue that the full fall zone of a 160-foot tower would pose safety risks to the community.  They also make a much broader argument, albeit in a footnote, that "a cell phone tower of *any* size is unsuitable at the tower location due to its proximity to the pre-existing subdivision into which the Tower Location is thrust[.]"  (Doc. 25 at 12 n.8 (emphasis in original).)  But the suitability of the site for *any* tower was not before the Board, and at no time was such a concern raised. The application before the Board was for a 160-foot cell phone tower.  (Doc. 29 at 11.)  To the extent Defendants attempt to argue this new, broader position now, the Court finds that it is not supported by any evidence on the record.

Defendants make four main arguments with regard to the safety of the proposed tower:  (1) Verizon has not guaranteed that the tower could not, under any circumstances, fall beyond the 54-feet discussed in the Sabre report (doc. 19 at 13 n.9;

---

[17]    Although the Board did not specifically address the variance requests after determining that the special use permit should be denied, Defendants have since clarified that the Board was considering the application in its entirety.  Thus, once the request to approve construction was denied, "all attendant and enveloped requests for that tower (such as the variance requests) were necessarily denied as well[.]"  (Doc. 29 at 11.)

doc. 25 at 17; doc. 29 at 7); (2) "[i]t is patently clear that if a 160 foot tall cell phone tower collapsed its full length, there are numerous safety hazards[18] within the Full Fall Zone" (doc. 19 at 13); (3) the Sabre report uses terms such as "most likely" and "assuming" and "likely" (doc. 25 at 17); and (4) the structure has not yet been built, so any safety assurances provided by the Sabre report are simply theoretical (doc. 29 at 4). At its core, Defendants' concern appears to be based on their perception that the tower could fall at a full 160 feet, and they argue that the Sabre report and Verizon's application do nothing to dispel that fear.

The Court briefly summarizes the evidence in the written record to determine if substantial evidence supported the Board's denial of the applications. The Staff discussed the tower's height briefly in its report and said "the additional height from 110 feet to 160 feet would not provide a significant increase in the amount of coverage to the area." (Doc. 16, Ex. 7.) The Staff additionally noted that some other towers within the County did exceed the maximum height, but that "the majority are county-owned and are used for public safety purposes."

---

[18] Defendants argue that if the tower fell at its full length, it would be within reach of a sidewalk utilized by school children, a busy thoroughfare, a residential street, and the boundary of a home's yard. (Doc. 25 at 16.) Verizon does not contest that these surrounding structures exist, but rather asserts that a full 160-foot fall would not occur with this type of monopole.
Defendants additionally assert that Verizon failed to inform Mr. Walter Walsh that the tower would be tall enough to fall on his home, his driveway, or his yard. (Doc. 18-1 at ¶ 26.) Verizon disputes this statement, as there is no evidence in the administrative record supporting it.

31

(Id.) As to the likelihood of a fall, the Staff Report simply summarized the Sabre Industries report, noting that "[t]he applicant states that the reduced setbacks would not cause safety concerns due to the unique design of the tower" and "in the extremely rare event of a tower failure, the monopole would be contained within an approximately 54 foot radius." (Id.)

Moving to the Planning Commission hearing, the fall zone of the tower was addressed by Mr. Strickland, but his comments aligned with the Sabre report in almost summary fashion. (Doc. 16, Ex. 10 at 4.) Of all the questions raised at the Planning Commission hearing, none addressed the tower's proximity to neighborhoods or sidewalks. Instead, they focused on, *inter alia*, the effectiveness of the tower and when another tower might be needed.

Finally, at the Board meeting, Chairman Cross raised for the first time concerns about the height of the tower and its proximity to neighborhoods, but after Verizon's representative summarized the design engineer's report, Chairman Cross simply stated that although he understood the concept it did not change the Board's concern. At no point in this meeting did anyone on the Board address any specific issues with the tower's height or its distance from residences and sidewalks. In fact, the Board only used the term "safety" generically without any specific indication of what was driving their concerns. Moreover, no

residents spoke at the meeting to present any additional concerns.

In contrast, Verizon presented an RF engineer report stating that the tower would be designed and built in compliance with FCC requirements and a report from Sabre Industries asserting that in the unlikely event of a tower failure, it would fold over onto itself, with a fall radius of 1/3 the pole's height. (Doc. 16, Exs. 1D & 1F.)

The Court concludes that the evidence in the written record does not support the Chairman's fears. Many courts have held that alleging safety concerns based on a pole's proximity to a neighborhood is insufficient to constitute substantial evidence in the face of unrefuted engineer reports. See Vertex Dev., L.L.C. v. Marion Cnty., No. 5:07-cv-380-OC-10GRJ, 2008 WL 2994259, at *18 (M.D. Fla. Aug. 1, 2008) (finding that a citizen's "unshakeable fears . . . that the tower would fall" on her home were "personal and subjective" and thus not "valid safety considerations" in light of "undisputed substantial expert and documentary evidence"); Group EMF, 131 F. Supp. 2d at 1340; OPM-USA-Inc. v. Brevard Cnty., 7 F. Supp. 2d 1316, 1324 (M.D. Fla. 1997) (finding no evidence of valid safety concerns where "an engineer certified that in the event of a failure the tower would fall within the confines of the site on which the tower was located"); Iowa Wireless Serv., L.P. v. City of

Moline, 29 F. Supp. 2d 915, 921 (C.D. Ill. 1998) (finding that a "layperson's testimony that a tower might fall is simply not probative evidence," given evidence presented that the tower was designed to collapse on itself); see also TBCom Props., 2007 WL 1970863 at *2 (holding that the denial of an application was not supported by substantial evidence where the applicant was the only one to present evidence relating to the proposed tower and the city responded "with generalized opinions and speculation").[19]

Group EMF is particularly instructive. There, the Coweta County Board of Commissioners denied a Special Use Permit based on the distance between the tower's potential fall zone and neighboring residences. Group EMF, 131 F. Supp. 2d at 1340-41. In response to concerns raised at the Planning Department meeting about the placement of the tower and the safety of neighboring land, Group EMF presented expert reports that "the proposed tower had been designed to fall completely within the premises leased by the company in the highly unlikely event that the tower did fall." Id. at 1340. At the public hearing, the Board of Commissioners failed to question this evidence and "no

---

[19]     Defendants attempt to distinguish these cases on their facts. For example, they point to the amount of materials submitted in support of those carriers' applications, the distances involved, and the physical presence of experts at the hearings.    Moreover, Defendants seem to take issue with the length of the Sabre report, as it was only one page.    The Court, however, fails to see how these differences affect the persuasive value of these cases in light of the unrefuted expert report presented in support of Verizon's application.

other evidence [was] offered regarding the structural integrity of the proposed tower or the tower's fall zone." Id. at 1342. The only contradictory evidence presented was the testimony of individuals opposed to the tower, one of whom based his concern on safety. Id. at 1341. Ultimately, the district court decided that because the Coweta County Board failed to question the engineer's evidence and no other contrary evidence was presented regarding structural integrity, the decision to deny the Special Use Permit on these grounds was not supported by substantial evidence. Id. at 1342.

Like Group EMF, Verizon presented an expert report regarding the structural integrity of the monopole, which went without contradiction. The Board similarly failed to raise any questions or concerns about Verizon's evidence.[20] On this point, in Group EMF the Coweta County Planning Department at least raised some concern about the placement of the tower, even if unsupported. Here, the Interim Director of the Columbia County Planning Department actually stated at the Planning Commission hearing that "if [the tower] were to fall, the fall radius is far lower than the actual height[.]" (Doc. 16, Ex. 10 at 4.)

---

[20]     Defendants attempt to blame Verizon for the Board's own lack of questions. According to Defendants, "Verizon fails to show that [engineers were] present to even answer such questions had they been posed." (Doc. 25 at 19 n.15.) The Court is not persuaded by this argument and is unaware of any requirement to present expert testimony. At no point in the application process or hearings was any concern raised that would necessitate the presence of the engineer. If the Board had genuine concerns over the structural integrity, they could have posed such questions and given Verizon the opportunity to respond.

Defendants additionally take issue with the language used in the Sabre report and its persuasive weight. The report, Defendants contend, uses language like "assuming" and "unlikely," which are hardly probative of the pole's safety. The Court is not persuaded by Defendants' desire for metaphysical certitude, and in any case, the Court's role is not to make credibility determinations. At no point did the Board raise any specific concerns about the Sabre report, and the Court cannot make a determination that the report is insufficient now without any indication that the Board did so.

That Verizon did not present evidence that the tower could never, under any circumstance, damage a neighboring structure is equally unavailing. Defendants use colorful rhetoric and analogies — referencing the placement of a cell phone tower in the Federal Judicial Center Complex and the Titanic — in making this argument. The Court certainly agrees with Defendants that nothing in Verizon's application guarantees with 100-percent certainty the tower could never harm a surrounding area. But this absence of certainty and risk is true regardless of whether Verizon sought a variance. Indeed, the Court can imagine any number of circumstances where a tower that fits squarely within the ordinance's requirements could still cause harm to neighboring structures. As was discussed above, courts around the country have made clear that speculation regarding a fall

zone is insufficient to refute engineer reports to the contrary, and the Court will follow that line of reasoning today. Indeed, to place conclusory and unsupported statements of the Chairman above the engineer's report would plainly go against the standard of review this Court is directed to apply. See Kreso, 2014 WL 4436418, at *1 ("Evidence is not substantial if it is overwhelmed by other evidence or if it constitutes mere conclusion.").

> c. *Verizon's Evidence in Support of the Applications*

As alluded to above, the Court has serious concerns as to whether Defendants may now allege — after not doing so at any time prior to this litigation — that Verizon failed to provide proper support for its variance and setback applications. As the Supreme Court recently held, a limitation "necessarily implied by the [TCA's] 'substantial evidence' requirement, is that local zoning authorities state their reasons when they deny applications." T-Mobile S., 135 S. Ct. at 815. And while "nothing in [the TCA] imposes any requirement that the reasons be given in any particular form[,]" the Board's reasons must be "stated clearly enough to enable judicial review." Id. In T-Mobile South, for example, the Supreme Court held that the locality need not provide its reasons in a written denial letter, but instead may rely on the meeting minutes to state its

reasons. Id. at 816. Here, the only reasons for denial in the written record are (1) a possible amendment to the height ordinance and (2) the tower's proximity to neighborhoods. At no point in either the Board's agenda (doc. 16, ex. 11), its minutes (doc. 16, ex. 12), or the hearing (doc. 16, ex. 13) did the Board state any other reason for the denial.

Even assuming the Court may properly entertain Defendants' argument, the Court finds that this reason too is unsupported by substantial evidence. Defendants' argument seems to boil down to one basic point: Verizon had the burden to support its application with sufficient evidence and Verizon failed to carry this burden. This failure, according to Defendants, formed the basis for the Board's denial, and there is substantial evidence in the written record to support their conclusion.

In support of this argument, Defendants assert that this action does not implicate the TCA at all "because Verizon's Applications simply failed to meet the requirements of valid local law[.]" (Doc. 25 at 13.) As a threshold matter, that Verizon's proposed tower failed to meet the local law is obviously true: if the tower met the ordinance requirements there would be no need for Verizon's variance applications. Even so, the TCA is implicated when a governing authority takes official action on an application affecting a cellular tower.

Here, Defendants also appear to argue that the one-page letter from Sabre Industries is insufficient to constitute an expert structural analysis, as it is simply a proposal to build the tower in the hypothetical sense.[21] There is nothing in the written record to support such a contention. Indeed, the Planning Department notified Verizon that its 71-page application[22] was complete; the Staff report emphasized that the proposal was consistent with the County's land use plan; and at no point did any member of the Staff, Planning Commission, or the Board raise any concern about the level of support provided in the application. Moreover, Defendants argue that Verizon's application was insufficient because the author of the Sabre report did not appear at the hearing or submit an affidavit. Again, nothing in the written record supports this argument either. At no point did any member of the Board question the reasoning of the report, but rather Chairman Cross said that he understood, but disagreed with, the concept. As above, a speculative fear that the tower might fall in the face of

---

[21]    Defendants additionally argue that the report, which lacks any indication of the author's qualifications, does not meet the requirements for expert opinions under Federal Rule of Evidence 702 or Daubert. (Doc. 29 at 9.)    The author's qualifications, however, go directly to a credibility determination that is not properly before this Court.

[22]    As one district court has held, the "provider must come forward with a certain minimal amount of information in support of its applications in order to prevail[.]" Omnipoint, 74 F. Supp. 2d at 122-23. The Court strains to see how a 71-page application full of graphs and reports would not constitute a "minimal amount of information."

evidence showing that it would collapse upon itself is not substantial.

Defendants cannot, following the denial of the application, present an *ad hoc* rationalization that Verizon's application was somehow sub-par or incomplete when no such argument was ever raised during the administrative process and there is no other written evidence to support such a conclusion. Accordingly, Verizon has met its burden of showing it presented sufficient evidence to support its applications.[23] To allow Defendants to use a blanket assertion that the applications were not properly supported — when no such challenge was raised and the applications included a number of reports in support — would run contrary to the intent of the TCA.

### d. *Conclusion*

To summarize, the Board stated that its reasons for denying the applications were (1) a soon-to-be introduced amendment to the height requirement; (2) the proposed tower's close proximity

---

[23] Throughout their briefs, Defendants raise a number of evidentiary challenges based on authentication of documents (doc. 25 at 9) and hearsay (id. at 17). As a preliminary matter, these reports are precisely the sort of documentation required by the Columbia County ordinances. (See, e.g., Columbia County Code §18-305(h)(requiring a written certification that the tower would be designed and constructed to meet structural requirements including wind and ice levels).) Defendants point to no specific ordinance that requires a document to be in a particular form. Moreover, the Sabre report actually includes the engineer's seal from the state of Georgia. (Doc. 16, Ex. 1F.) In any event, "formal rules of evidence do not apply in administrative proceedings but rather the admissibility of evidence depends only on whether it is such evidence as a reasonable mind might accept as probative." Atl. Marine, Inc. v. Bruce, 661 F.2d 898, 900 (5th Cir. 1981) (quoting Young & Co. v. Shea, 397 F.2d 185, 188 (5th Cir. 1968)); Wenzel v. Richland Twp., No. 06-11031, 2006 WL 2911635, at *14 (E.D. Mich. Oct. 10, 2006).

to neighborhoods; and (3) a lack of support for the applications in the first instance.

First, because applications must be viewed in the context of existing ordinances, the only valid objections before the Court are the safety concerns and the evidentiary issues. Second, applying the deferential standard of the TCA, at no point in the written record is any legitimate concern raised about the tower's safety or the sufficiency of Verizon's application. Indeed, there are two reports on the record, the first stating that the tower would be in compliance with FCC requirements and the other explaining that the tower is designed to collapse onto itself. In response to these reports, Defendants at no point raised any specific questions or presented any contrary evidence, instead stating that they "understand the concept." The Court is thus presented with absolutely no evidence that would contradict the engineers' reports or the conclusion that the tower would not pose a risk to surrounding structures. For that reason, the Court must conclude that Defendants' decision to deny the applications on these grounds was not supported by substantial evidence.

   *iii.*   *Remedy*

The TCA, while providing clear instruction for judicial review, makes no mention of the appropriate remedy. <u>See</u> <u>Preferred Sites</u>, 296 F.3d at 1220. A number of courts, however,

have determined that equitable relief is appropriate.  See id.
at 1220 n.12 (listing cases).  Verizon seeks an injunction
requiring Defendants to approve its application.  Defendants
counter with two alternatives for this Court: (1) conduct a
harmless error analysis or (2) remand the case back to
Defendants to clarify the reasons for its decision.

First, the Court is not convinced that the Board's failure
to support its decision with substantial evidence is "harmless
error."  To support their contention, Defendants latch on to
language in T-Mobile South, in which Justice Alito's concurring
opinion and Chief Justice Roberts' dissenting opinion raise
concerns about whether the defendant's failure to comply with
the TCA's "in writing" requirement was a harmless error.  135 S.
Ct. at 819 (Alito, J., concurring) & 823 (Roberts, C.J.,
dissenting).  The majority left the issue of remedy and harmless
error to the Eleventh Circuit to address on remand.  Id. at 818-
19.

The facts of T-Mobile South do not, in this regard, square
up to the facts of the case at bar.  In T-Mobile South, the
error was the defendant's failure to put the decision in
writing.  In that case, it is foreseeable that the aggrieved
party may have been aware of the basis for denial and the
writing requirement could serve as a mere formality.  Here, the
Board failed to support its denial with substantial evidence in

42

the first place. Stated differently, the reasons it provided in writing lacked evidentiary support. Defendants attempt to analogize T-Mobile South to the case at bar by drawing a distinction between procedural requirements — such as "in writing" and "substantial evidence" — and the three aforementioned substantive violations of the TCA, arguing that violation of a procedural matter does not thwart the purpose of the TCA like the violation of a substantive provision. (Doc. 25 at 23.) But that is the extent of Defendants' argument: that the requirement is procedural and therefore any error is harmless. In any case, binding precedent in this Circuit forecloses such argument. Preferred Sites, 296 F.3d at 1222 (finding that an injunction is an appropriate remedy for violation of the substantial evidence requirement).

The Court is similarly not persuaded that remanding the issue to the Board to clarify its reasoning would satisfy the purpose of the TCA or its mandate to resolve issues on an expedited basis. In this regard, Defendants state that "the Court should not simply override the County's concerns about the location of the proposed cell phone tower without an actual hearing where witnesses can be sworn and cross-examined," and "[t]he administrative process below simply is not designed to provide or elucidate a full record of these issues [] because that is not the purpose of purview of a local government in

making land use decisions." (Doc. 19 at 22-23.) The Court disagrees — by mandating that all decisions implicated by the TCA be supported by substantial evidence, Congress explicitly required local governments to engage in just such an inquiry.

Even so, a number of other federal courts in this state have held that remanding the matter back to the local authority "would frustrate the TCA's intent to provide aggrieved parties full relief on an expedited basis." BellSouth Mobility, 944 F. Supp. at 929; Group EMF, 131 F. Supp. 2d at 1346; AT&T Wireless PCS, Inc. v. City of Chamblee, 10 F. Supp. 2d 1326, 1334 (N.D. Ga. 1997). The Court finds the reasoning of these cases persuasive. Here, as in Group EMF, Defendants had ample opportunity to present their own experts or evidence in support of their decision at the hearing and chose not to do so. See Group EMF, 131 F. Supp. 2d at 1346.

In AT&T Wireless, then-District Judge Julie Carnes found that mandamus relief is "particularly appropriate" where the plaintiff "demonstrated its compliance with all valid requirements necessary to receive a construction permit, and defendant [] demonstrated its reluctance to issue this permit[.]" AT&T Wireless, 10 F. Supp. 2d at 1333.[24] The same rationale applies here. Verizon has shown its compliance with

---

[24] After finding that remand would frustrate the purpose of the TCA, Judge Carnes ordered that the defendant issue the permit for the plaintiff's proposed tower. AT&T Wireless, 10 F. Supp. 2d at 1334.

all requirements to receive approval of its rezoning and special use permit, as well as its variance requests, and Defendants are clearly reluctant to grant the application. Moreover, the Court finds that the Board's failure to support its decision was not a harmless error and that remanding the issue to the Board to clarify its reasoning would frustrate the purpose of the TCA. Because Defendants have not presented the Court with any other form of relief that would be more appropriate, the Court finds an injunction to be the proper remedy and **ORDERS** Defendants to grant Verizon's applications.

## B. Proper Parties

Defendants also argue that the Commissioner Defendants cannot be sued in their individual capacities. To support this assertion, they cite O.C.G.A. § 36-5-22.1, which confers jurisdiction to control property of the county onto the governing authority of each county. Here, Verizon seeks an injunction requiring the Board to grant its applications. It is the Board that is vested with this authority, and not the Commissioners in their individual capacities. See La Fayette v. Walker Cnty., 108 S.E. 218, 221 (Ga. 1921) ("Here it is proper for the commissioners, who, in their capacity as representatives of the county, are doing, or threatening to do, the acts sought to be enjoined. It is not a suit against the commissioners alone, but really designed as one against the county[.]").

Given the relief sought by Verizon and the fact that the Commissioners would not have authority in their individual capacities to grant it, the Court hereby **DISMISSES** all claims against the Commissioners in their individual capacities.

Moreover, Defendant Ron Thigpen is no longer a member of the Board of Commissioners. Under Federal Rule of Civil Procedure 25(d), Mr. Thigpen's successor shall be automatically substituted as a party in this matter. The Court takes judicial notice that Doug Duncan succeeded Ron Thigpen as the Commissioner for District 1 of Columbia County, Georgia. Accordingly, the Clerk is **DIRECTED** to substitute Mr. Duncan for Mr. Thigpen as the proper party.

## V. CONCLUSION

Based on the foregoing, Verizon's motion for summary judgment (doc. 21) is hereby **GRANTED** and Defendants' motion for summary judgment (doc. 18) is **DENIED**. Verizon's Motion to Strike (doc. 28) and Amended Motion to Strike (doc. 31) are **GRANTED**. Defendants are hereby **ORDERED** to grant Verizon's application for rezoning and special use permit, as well as its requested variances. Additionally, Verizon's Motion for Oral Argument (doc. 32) is **DENIED**. Finally, all claims against Commissioners in their individual capacities shall be **DISMISSED**

and the Clerk of Court is **DIRECTED** to substitute Doug Duncan for Ron Thigpen as a defendant in this matter.

    **ORDER ENTERED** at Augusta, Georgia, this 23rd day of April, 2015.

                            HONORABLE J. RANDAL HALL
                            UNITED STATES DISTRICT JUDGE
                            SOUTHERN DISTRICT OF GEORGIA